**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**
**CIVIL DIVISION**

| | | |
|---|---|---|
| **FREDERICK MAWALLA** | : | |
| | : | |
| **Plaintiff** | : | |
| | : | **Civil No.: 1:07-cv-01538 (EGS)** |
| **v.** | : | |
| | : | |
| **LINDA HOFFMAN** *et al.* | : | |
| | : | |
| **Defendants.** | : | |

**REPLY MEMORANDUM OF DEFENDANTS**
**IN RESPONSE TO PLAINTIFF'S OPPOSITION TO**
**MOTION TO DISMISS PLAINTIFF'S COMPLAINT**

Defendants Linda Hoffman, Esquire and the law firm of Freilicher & Hoffman, P.C., submit this Reply Memorandum in support of its Motion to Dismiss Plaintiff's Amended Complaint (referred to as "Motion" and cited as "Mot. at __").

**I.      INTRODUCTION**

On November 14, 2007, defendants filed a Motion to Dismiss demonstrating their entitlement to dismissal of the Complaint on several grounds: 1) plaintiff's legal malpractice claim is barred in its entirety by the expiration of the applicable statute of limitations; 2) any breach of fiduciary duty claim likewise fails as a matter of law because it is untimely, insufficiently plead and because of the absence of both a breach of legal duty and resulting injury; and 3) proximate cause is legally absent because plaintiff's alleged injury (his inability to obtain a visa, become a permanent resident and remain in this country) was not proximately caused by any alleged act or omission of his former immigration counsel.

On December 19, 2007, plaintiff filed an 8 page Opposition to the Motion to Dismiss (referred to as "Opposition" and cited as "Opp. at __"), which is devoid of any meaningful

discussion of the legal issues and utterly fails to refute defendants' entitlement to dismissal of plaintiff's pleadings.  Replete with obfuscation, circular reasoning and legal distortions, the opposition papers only underscore how deficient the claims really are.  As demonstrated in this Reply, when stripped of the factual contortions, references to irrelevant matters, and misinterpretation of case law, the Opposition fails to cure the fatal and insurmountable legal defects in the claims asserted in the Complaint.

## II.  PLAINTIFF HAS FAILED TO OVERCOME DEFENDANTS' SHOWING THAT THE LEGAL MALPRACTICE CLAIM (COUNT I) IS BARRED BY THE EXPIRATION OF THE STATUTE OF LIMITATIONS

As the first basis for dismissal, defendants have demonstrated that the legal malpractice claim (Count I) is barred by the expiration of the statute of limitations.  Mot. at 14-16.  This is so because the pleadings establish that, as a matter of law, plaintiff was "injured" in the Summer of 2003 --- and he was unquestionably aware of the injury ---when the Immigration Service denied his request for a change in status to that of a visitor's visa (I-539).  Mot. at 15-16; Compl. at ¶ 27. It was the denial of the I-539 that required plaintiff to leave the country since he no longer possessed a valid visa, was "out of status" and subject to deportation under 8 U.S.C. § 1227(a)(1)(C)(i), *Id.,* a critical point nowhere addressed, let alone refuted, by the Opposition. Opp., *passim.*

Also undisputed is plaintiff's 2003 discharge of defendants as his lawyers and his retention in late 2003 of the first of two other immigration attorneys, which ended defendants' legal representation for purposes of the "continuous representation rule" and impliedly shows Mawalla's dissatisfaction with his former immigration counsel.  Mot. at 16; Compl. at ¶¶ 27-28, 30. Based on the allegations set forth in the Complaint, plaintiff unquestionably knew that he sustained an injury in the Summer of 2003, when his effort to extend his stay was rejected by the

283875.1

Immigration Service.  Thus, as demonstrated, even under the "continuous representation rule," plaintiff was required to bring this action within 3 years after the termination of defendants' legal representation, or by the end of 2006, which he failed to do.  Mot. at 14-16.

Plaintiff's Opposition completely fails to overcome the fundamental showing that the legal malpractice claim is barred by the expiration of the applicable statute of limitations.  In a desperate effort to avoid dismissal and to unduly delay the accrual of his claims, plaintiff rests his entire argument on a misconstruction of the law and an incorrect assertion that his injury occurred much later in time than it, in fact, had actually occurred (focusing improperly on August 20, 2004).  Opp. at 7-8.

In a 1½ page discussion, plaintiff can only resort to arguing that his "injury" occurred at the latest possible date, ignoring both the law and the operative facts as pled in his own Complaint.  *Id*.  While the general legal premise asserted by plaintiff is correct --- namely, that the discovery rule can apply to legal malpractice cases --- Mawalla's application of that doctrine is patently incorrect.  In that regard, plaintiff unconvincingly asserts that he was not injured until August 20, 2004, when Intelsat withdrew its I-140 Petition, Opp. at 7, an assertion which is patently illogical and factually wrong.

The pleadings irrefutably establish that *plaintiff's injury occurred in the Summer of 2003*, when his effort to extend his stay was rejected by the Immigration Service.  Compl. at ¶ 27.  As a matter of law, under the immigration scheme codified at 8 U.S.C. § 1227(a)(1)(C)(i), the denial of Mawalla's I-539 required plaintiff to leave the country since he no longer possessed a valid visa, was "out of status" and subject to deportation, a critical point plaintiff concedes by silence.  Opp., *passim.*  This development, in turn, caused plaintiff to terminate defendants as his immigration attorneys, Compl. at ¶¶ 28, 30, thus implying his dissatisfaction with their legal

services and/or the outcome of efforts to allow him to remain in this country.  Thus, it is because of events occurring in the Summer of 2003 --- *not* Intelsat's withdrawal of its previously filed I-140 Petition --- that plaintiff was "injured" and which started "the clock" running on the accrual of any claims.  Plaintiff's unconvincing alternative proffer of August 20, 2004 is simply a red herring.

As shown, plaintiff was *not legally entitled to proceed* with Intelsat's previously filed I-140 Petition because had not worked for the company since the end of 2002.  Mot. at 7-11.  This point is unquestionably conceded by plaintiff, both by silence in the Opposition and expressly in his own government filings --- namely, that he was statutorily ineligible to proceed with an adjustment of status application based upon a job that had ended some two years before.  *Opp. passim*; Mot. at 23-24 (and Exhibit 4 thereto).  Therefore, after November 2002, he could not have legitimately pursued or reopened Intelsat's I-140 Petition, leading to the unassailable conclusion that his former employer's withdrawal of the I-140 in August 2004 was of no consequence whatsoever, had no impact on plaintiff's immigration status, and did not cause any "injury."  Mot. at 22-24.  This conclusion is confirmed by the determination of the U.S. Citizenship and Immigration Service ("the Immigration Service") that Intelsat's I-140 Petition had been "automatically revoked" because plaintiff was no longer employed by Intelsat, a prerequisite to the filing for a green card.  Mot., Exhibit 1 at p. 2; 8 C.F.R. § 205.1(a)(3)(iii)(c).

Obviously recognizing the futility of his position, plaintiff next resorts to arguing that, by virtue of a letter dated August 20, 2004 (from the U.S. Department of Homeland Security), he "became aware" that his former immigration counsel somehow did not "take advantage of the changes in the immigration law," Opp. at 7, which (even if true) does not salvage his Complaint.  On this issue, although not entirely clear, plaintiff appears to suggest that defendants "could have

283875.1

filed a Form I-485" (for permanent residence status) in July 2002, which Mawalla theorizes would have given him more time to find a "new job" in "the same or similar occupational classification as the job for which the petition was filed." Opp. at 5. Although he now claims to have been unaware --- until August 2004 --- of the possibility that he could have filed an I-485 earlier, plaintiff's present professed ignorance of the immigration law does not alter when his claims began to accrue for statute of limitations purposes.[1]

As to Mawalla's state of awareness, the "knowledge" element of the discovery rule does not mandate that plaintiff know either the precise nature of the wrong or the correct legal theory. *Knight v. Furlow*, 553 A.2d 1232, 1236 (D.C. 1989); Mallen & Smith, *Legal Malpractice*, § 22.15 at pp.427, Thompson/West (6th Ed. 2006); *Melgard v. Hanna,* 45 Ore. App. 133, 607 P.2d 795 (1980); *see* also, *Levin v. Berley,* 728 F.2d 551 (1st Cir. 1984). A plaintiff need not sustain or identify all of his damages for a cause of action to accrue. *Galucci,* 2007 U.S. Dist. LEXIS 63050 at *10.

Here, however, resort to the discovery rule is unnecessary since any legal malpractice action would have accrued when plaintiff suffered actual injury, *Poole v. Lowe*, 615 A.2d 589, 592-3 (D.C. 1992); *Byers v. Burleson*, 713 F.2d 856, 859-860 (D.C. Cir. 1983) --- which in this case was readily apparent by virtue of the Immigration Service's denial in the Summer of 2003 of a visitor's visa. Mot. at 15.

Even if the Court were to conclude that injury was not "readily apparent" and were to apply the "discovery" rule, plaintiff need only have knowledge of (or by the exercise of

---

[1] Perhaps because it belies his newly minted theory, plaintiff chooses to ignore defendants' proffer that Intelsat informed its employees that they were eligible to concurrently file their adjustment of status applications in 2002. Mawalla also prefers not to address defendants' assertion that, after being informed of the required $5,580 for legal and filing fees, plaintiff chose not to file his I-485 at his own expense, but rather decided to wait until 2003 to file his I-485 to avail himself of Intelsat's offer to pay his legal and filing fees. Mot. at n. 7. *See* also Exhibit 8, attached hereto. As discussed, there was no reason to be concerned about the timing of this filing since plaintiff could always file a Form I-485 later during his employment.

reasonable diligence should have knowledge) of the existence of the injury, its cause, and some evidence of wrongdoing. Mot. at 14-15 (and cases cited therein). Thus, as demonstrated, it is sufficient for statute of limitations purposes that plaintiff knew in the Summer of 2003, and at numerous points thereafter, that he was no longer eligible to remain in the United States and that he terminated defendants as immigration counsel soon thereafter and not later than the "end of 2003."

Moreover, any suggestion that plaintiff would have been approved for permanent residency, even if an I-485 had been filed at an earlier point in time, Opp. at 4-5, is pure conjecture. After the November 2002 RIF, plaintiff was legally ineligible for adjustment of status since he was pursuing an employment-based Immigrant Petition. Once terminated, plaintiff had no basis upon which to file an adjustment of status application – by virtue of the RIF, Intelsat did not intend to continue to sponsor him. Therefore, because of his statutory ineligibility under the immigration laws, plaintiff cannot rely on his unauthorized and improper pursuit of Intelsat's previously filed employment-based application for adjustment of status (Form I-485) based upon a job that had been withdrawn years earlier. Mot. at 8-12. As can be seen, the interim rule upon which plaintiff relies, does not change the substantive requirements governing eligibility for and adjudication of the Form I-140 nor for the Form I-485. Opp. Exhibit A at p. 2.

Plaintiff cannot avoid the legal consequences of dismissal by speculating that, *if* an I-485 been filed earlier, it would have been approved and "he would have had a greater period of time to seek a new job," Opp. at 5. It simply does not stand to reason that, even with additional time, even if afforded, plaintiff would have found another qualifying job. Even considering the American Competitiveness in the Twenty-First Century Act of 2002 ("AC 21"), codified at 8

U.S.C. §1154(j), referenced at Opp. at 5, plaintiff *never located substitute employment in his industry* ("in the same or similar occupation") --- and his Complaint does not aver otherwise.

It is undisputed that there was no available potential 'employer' to sponsor plaintiff for a "green card," as required under the immigration laws --- this is so despite his having remained in this country well into 2004 (for nearly 2 years after being subject to the RIF) with more than ample opportunity to find such a job. Compl. at ¶¶ 37-38; Mot. at 9-10. It is simply of no moment that federal law may have permitted plaintiff to adjust his status to that of permanent resident at an earlier point in time, since plaintiff cannot establish that he had a *bona fide* offer of employment from a new employer "in a same or similar occupation."

For these reasons, the Complaint irrefutably establishes, as a matter of law, that plaintiff's injury occurred in the Summer of 2003, when his effort to extend his stay was rejected by the Immigration Service --- *not* when Intelsat withdrew in August 2004 its previously filed I-140 Petition. Therefore, any claims accrued in the Summer of 2003 and by the end of 2003, when he terminated defendants' legal representation. Having not been brought within 3 years, his legal malpractice claim is now time-barred by the applicable statutes of limitations.

## III.   PLAINTIFF HAS FAILED TO SALVAGE ANY BREACH OF FIDUCIARY DUTY CLAIM (COUNT II), WHICH FAILS AS A MATTER OF LAW

As demonstrated, none of plaintiff's so-called 'breaches' of fiduciary duty is actionable for separate reasons. Mot. at 16-25. For the reasons set forth below, plaintiff cannot salvage any breach of fiduciary duty claim (Count II), which fails as a matter of law.

283875.1

1.    **Plaintiff Fails to Overcome Defendants' Showing that Any Allegations Regarding Filing of Documents with the Immigration Service and/or Providing Advice are Duplicative of the Legal Malpractice Claim and are Time Barred.**

As to the first alleged breach of fiduciary duty, defendants have demonstrated that any criticism regarding their filing of documents with the Immigration Service and/or providing legal advice, are duplicative of the allegations of legal malpractice and are time barred since any alleged acts or omissions took place during the course of defendants' legal representation, which ended in 'late 2003.'  Compl. ¶¶ 28, 30; Mot. at 17.  As shown, any breach of fiduciary duty claim should have been brought by "late 2006," three years thereafter, which was not done.  Mot. at 17.

As discussed in Section II of this Memorandum, plaintiff does not refute defendants' fundamental showing in this regard, warranting the dismissal with prejudice of the breach of fiduciary duty claim (concerning the filing of documents with the Immigration Service and/or providing legal advice).

2.    **Notwithstanding Plaintiff's Opposition, any Breach of Fiduciary Duty Claim based upon an Alleged Conflict of Interest, is Likewise Time Barred.**

For the reasons set forth in Section II of this Memorandum, plaintiff fails to overcome defendants' entitlement to dismissal of the second component of plaintiff's perceived breach of fiduciary duty claim concerning an alleged conflict of interest.  Mot. at 2.  As shown, this breach of fiduciary duty claim, filed on August 20, 2007, is also barred as untimely.

3.    **Defendants Have Established that any Allegation of "Sabotage" of Plaintiff's Immigration Case Fails for Lack of Specificity, the Absence of Both a Breach of a Legal Duty and Resulting Injury**

As shown in the Motion to Dismiss, plaintiff's final breach of fiduciary duty theory regarding some undefined and unspecified 'sabotage' of the immigration case (that supposedly

283875.1

8

"made it impossible for Mr. Mawalla to adjust his status") is nowhere spelled out in Count II of the Complaint, except to the extent that it occurred on August 20, 2004.  Compl. at ¶¶ 49, 50; Mot. at 18-19.

The Opposition papers are equally elusive and obscure with respect thereto, Opp. at 4-6, and cannot, by any stretch of the imagination, be said to fill the fatal void in plaintiff's vague and ambiguous pleading so as to satisfy Fed.R.Civ.P. 8.  Mot. at 18-19 (and cases cited therein). Even considering plaintiff's recent submission, no clue is provided as to the particulars of the conduct complained of, let alone what duty was owed to plaintiff or how any conduct in any way affected his immigration status. *Id*.  All plaintiff can do is provide a one sentence self-serving generality that is devoid of any detail or explication.  Opp. at 6.

Plaintiff's Opposition, however, offers nothing new, let alone illuminating, regarding any purported "wrongdoing" that, according to the pleadings, occurred on August 20, 2004.  Compl. at ¶ 50.  The only reference to that particular date is set forth in plaintiff's recitation of "Factual Background," wherein the Opposition simply regurgitates the passing reference of Paragraph 33 of the Complaint --- namely that "Intelsat sent a letter dated August 20, 2004 to [the Immigration Service] withdrawing Mr. Mawalla's I-140 application.  This letter listed [Ms. Hoffman and her firm] as the recipient of the copy of this letter."  Opp. at 3, ¶ 13; *compare* Compl. at ¶ 33.

This vague and essentially meaningless assertion about a submission by Intelsat --- the former employer --- simply does not remotely set forth anything that could conceivably give rise to a breach of fiduciary duty on the part of former immigration counsel.  More significantly, however, is plaintiff's unequivocal concession that "Intelsat was acting within its right to withdraw the I-140," a point that wholly undermines any possible claim against defendants under these circumstances.  Thus, if the former employer had the legitimate right to withdraw its

9

previous I-140 Petition with respect to an employee who had not worked for the company for nearly 1½ years, it is unfathomable that such withdrawal on August 20, 2004 could constitute the predicate for a breach of fiduciary duty claim.[2]

Defendants have also demonstrated that any claim for breach of fiduciary duty (stemming from events in August 2004) fails as a matter of law based upon the absence of both a breach of any legal duty owed to a former client and the lack of resulting injury. Mot. 20-24 (and cases cited therein). *Id.* Even considering the opposition papers, plaintiff has not, and cannot, show an actual fiduciary breach (either of confidentiality or loyalty) that was the proximate cause of any injury.

As an initial observation, plaintiff seems to make no claim, nor could he, that defendants somehow breached any duty of confidentiality after the cessation of the legal representation in the end of 2003. In that regard, both his Complaint and Opposition are fatally silent on this issue. Compl,. *passim*; Opp. *passim.* As shown, there is absolutely no basis to assert that defendants disclosed any confidential information that had been obtained during the prior representation and, in that regard, plaintiff's loss of employment was in no way "confidential" and was fully known by Intelsat as the ex-petitioning employer. Mot. at 22-24.

As to any possible claim of breach of loyalty, there is no allegation that defendants had any knowledge about or reason to believe that plaintiff (through successor counsel) had filed an adjustment application in April 2004, based on a job that had terminated years earlier. Opp. at 2-

---

[2] Plaintiff cannot legitimately be heard to assert that "but for" certain unspecified "advice," "Intelsat would not have revoked Mawalla's I-140" and he "would have been able to adjust his status." Opp. at 6. However, out of an abundance of caution and to clarify any misunderstanding at this stage of the proceedings, defendants attach the Affidavit of Patricia Casey, Senior Vice President and Deputy General Counsel of Intelsat, stating that, by virtue of having no longer employed Mr. Mawalla, Intelsat withdrew its I-140 Petition (that had previously been filed) and did so *on its own initiative.* As attested, defendants did not advise or recommend that Intelsat withdraw the I-140 Petition, which was done by Intelsat because it could no longer sponsor Mr. Mawalla, who was no longer employed by Intelsat and had not been employed since December 2002. *See* Exhibit 8, attached hereto. To the extent the Court considers it necessary to resolve this factual issue, defendant offers the Affidavit pursuant to Fed.R.Civ.P. 56 and requests that summary judgment be entered in defendant's favor as to the breach of fiduciary duty claim (Count II).

3, ¶ 10.   Nor does the Opposition aver that either defendants or Intelsat had knowledge that plaintiff had improperly filed an adjustment application based on a job offer that had been withdrawn in 2002, let alone that he would try to proceed with a prior sponsorship after having been terminated, which is wholly impermissible under the immigration laws.  Mot. at 21;  Opp., *passim*.  Plaintiff never bothers to address this fundamental point.

As demonstrated in the attached Affidavit from the Senior Vice President and Deputy General Counsel of Intelsat, neither the company nor former immigration counsel were aware that plaintiff was pursuing an adjustment application based upon a job that terminated in 2002. Moreover, the Affidavit shows that defendants did not advise Intelsat regarding the withdrawal of plaintiff's I-140 Petition, which was done by Intelsat on its own initiative.  *See* Exhibit 8, attached hereto.

Leaving aside the lack of knowledge regarding plaintiff's ongoing but unsuccessful efforts to become a permanent resident, Mawalla also never deals with defendants' showing that they, as immigration practitioners, have an ongoing obligation of candor owed to the immigration authorities regarding changes in employment circumstances of immigrant applicants.  Mot. at 21-22 (and citations cited therein); Opp., *passim*.  Therefore, Mawalla must be deemed to concede that his former immigration counsel could have --- if necessary --- assisted Intelsat in informing the immigration authorities of changes in employment circumstances. Indeed, plaintiff explicitly acknowledges that Intelsat had the absolute right to withdraw its previous support for plaintiff's employment-based immigration visa after the 2002 RIF.  Opp. at 6.  For these reasons, there can be no conceivable basis for any possible claim of breach of loyalty against defendants.

283875.1

Finally, plaintiff never satisfactorily explains how he was in any way injured by Intelsat's August 2004 notification to the immigration authorities of the withdrawal of the I-140 petition. Opp. at 4-6. As demonstrated in the Motion, the prior RIF in 2002 automatically revoked plaintiff's ability to apply for a green card, which was not approvable either in 2004 or when it was filed (since the adjustment application was filed after the November 2002 RIF) and the Immigration Service itself determined that the Petition was "automatically revoked" by virtue of Intelsat's termination of plaintiff's employment. Mot. at 24-25 (and citations therein). Indeed, the Opposition is conspicuously silent regarding plaintiff's statutory ineligibility to proceed with an adjustment of status application based upon a job that had ended some two years before --- a circumstance not impacted by Intelsat's August 2004 communication to the immigration authorities. Opp., *passim*.

Also not addressed in the Opposition is the fact that *both the Immigration Service and the Department of State were aware --- long before August 2004 ---* that plaintiff had been terminated from the job at Intelsat (as required under the immigration laws) and therefore he could no longer proceed on the prior I-140 petition, a conclusion plaintiff himself acknowledged in one of his own immigration filings. Mot. at 22-24, Exhibits 5 and 7 (disclosures first, to the State Department at the time of the RIF in 2002 and thereafter by Mawalla himself in January 2003, when he filed the I-539 form for a visitor's visa to temporarily extend his stay in the U.S.). By virtue of the prior knowledge on the part of the immigration authorities, it cannot be said that Intelsat's August 2004 notification had any impact whatsoever on plaintiff's status.

In light of the propriety of Intelsat's August 2004 formalized notification of the previous cessation of its employer sponsorship, which had already been disclosed to immigration authorities well prior to that time and which had already automatically revoked the I-140 petition

as of the time of the RIF, nothing that occurred in August 2004 in any way impacted Mr. Mawalla's immigration case. Therefore, any breach of duty claim stemming from the events of August 2004 fails as a matter of law.

## IV. PLAINTIFF HAS NOT REFUTED DEFENDANTS' SHOWING THAT HIS ALLEGED INJURY WAS NOT PROXIMATELY CAUSED BY ANY ALLEGED ACT OR OMISSION OF HIS FORMER IMMIGRATION ATTORNEYS

As demonstrated, plaintiff cannot establish that he would have prevailed in the underlying case before the Immigration Service, but for the alleged acts or omissions of defendants --- to the contrary, he was statutorily ineligible as a matter of law and he lost all efforts to become a permanent resident despite multiple filings, requests for reconsideration and appeals. Mot. at 25-30. Therefore, any alleged injuries (an inability to obtain a visa, change his immigration status, obtain permanent residency and remain in this Country) were not proximately caused by his former immigration counsel and the entire Complaint fails as a matter of law. *Id*.

Because an I-140 Petition (if approved) only allows the alien to work *for the named employer* and, possibly thereafter petition for adjustment to permanent resident, through Form I-485, the existence of a qualifying job is the lynchpin. Mot. at 27-28. Defendants have demonstrated that proximate causation is fatally lacking because the Complaint does not aver any eligibility for a change in plaintiff's immigration status; it does not allege that plaintiff found a qualifying job and/or substitute sponsoring employer in satellite engineering (to enable him to qualify under AC21 or convert to an H-1 non-immigrant visa to work at another special occupation). Because he was *ineligible for adjustment of status*, plaintiff cannot prove, as a matter of law, the required causation element of his claims --- namely that he would have been successful in his underlying immigration case and would have obtained permanent residency, a visa, or a change in status, *but for* the conduct of his former immigration counsel. Mot. at 28-

283875.1

30. It is for these reasons that, to the contrary, he lost all of his multiple immigration appeals and motions to reopen/reconsider. *Id.*

Plaintiff's Opposition does not cure this fatal defect and wholly ignores the death knell to his claims delivered by Judge Collyer's January 5, 2007 finding that "Mr. Mawalla was ineligible to adjust status and USCIS [the Immigration Service] properly denied his I-485 application." Mot. at 29-30. This determination alone, now a final judgment on the merits, is definitive and dispositive of the proximate cause issue. Because plaintiff *was precluded by law* from obtaining the relief requested ---- namely an adjustment to permanent residency status --- based on his statutory ineligibility, he has not, and cannot as a matter of law, show that he suffered any injury that was proximately caused by the legal representation of former immigration counsel. It is incontrovertible that, based on the pleadings, proximate causation --- the essential "but for" element of his malpractice and breach of fiduciary duty claims --- is fatally lacking, warranting the dismissal of the Complaint with prejudice.

In a final unavailing effort to overcome this insurmountable legal obstacle to his Complaint, plaintiff can do nothing more than offer circular reasoning to avoid dismissal. Plaintiff creates the illusion of being entitled to change his immigration status by stacking erroneous assumption upon erroneous assumption. The foundation for the illusion is the imaginary concept that *if* a Form I-485 had been filed at some earlier point in time (prior to the expiration of the 180 days period under AC21), and *if* it had been granted, Mawalla "would have had a greater period of time to seek a new job" and "take advantage" of a previously filed I-140 Petition filed by Intelsat. Opp. at 5. He claims that this would have allowed him to stay in the country longer, which plaintiff so deftly converts into a guarantee of obtaining a substitute qualifying job in satellite engineering, which is then quickly labeled as "an ability to adjust his

status" and which is then somehow magically transformed into a "change in permanent residency" by the mere stroke of a pen. Opp. at 5-6.

Not only is plaintiff's fanciful notion wholly speculative and factually incorrect, but he cannot be allowed to turn a blind eye to the law --- indeed, the express language of the *Mawalla* Opinion makes clear that AC21 benefits are only available for aliens whose adjustment "has been filed." Mot. Exhibit 1 at 9; 8 U.S.C. § 1154 (j). However, *plaintiff was statutorily ineligible to file an adjustment of status application* based on a previous and "automatically revoked" sponsorship by Intelsat, which had long before withdrawn its offer of employment at the time of the 2002 RIF. Plaintiff's adjustment application, filed nearly two years after his termination from Intelsat, was simply not proper and, without a current and valid visa, he was ineligible to seek adjustment to status under 8 U.S.C. §1255 (c)(2). Mot. at 30 (law precludes adjustment of status for an alien "who is in unlawful immigration status *on the date of filing the application* for adjustment of status.").

As discussed earlier in this Memorandum, any suggestion that plaintiff would have been approved for permanent residency, even if an I-485 had been filed at an earlier point in time, Opp. at 4-5, is pure conjecture. It does not follow that, even if afforded additional time, plaintiff would have found another qualifying job. In point of fact, Mawalla *never located substitute employment in his industry* ("in the same or similar occupation") --- and his Complaint does not aver otherwise. It is undisputed that there was no available potential 'employer' to sponsor plaintiff for a "green card," as required under the immigration laws --- this is so despite his having remained in this country well into 2004 (for nearly 2 years after being subject to the RIF) with more than ample opportunity to obtain such a job. Compl. at ¶¶ 37-38; Mot. at 9-10.

Accordingly, plaintiff has failed to overcome defendant's unassailable showing that, based on the pleadings, proximate causation --- the essential "but for" element of any malpractice and breach of fiduciary duty claims --- is fatally lacking, warranting the dismissal of the Complaint with prejudice.

## V.    <u>CONCLUSION</u>

For the reasons set forth herein, in the Motion to Dismiss, and coupled with those appearing to the Court, plaintiff has failed to overcome defendants' entitlement to dismissal of the Complaint with prejudice in its entirety.

> Respectfully submitted,
>
> WILSON, ELSER, MOSKOWITZ,
> EDELMAN & DICKER, LLP
>
>
> By:    */s/  Laura N. Steel*
>       Laura N. Steel, Esquire (Bar No. 367174)
>       Kathleen H. Warin, Esquire (Bar No. 492519)
>       The Colorado Building, Suite 500
>       1341 G. Street, N.W.
>       Washington, D.C. 20005
>       Tel.: (202) 626-7660
>       Fax: (202) 628-3606
>       *Counsel for defendants, Linda Hoffman*
>       *and Freilicher & Hoffman, P.C.*

283875.1

**CERTIFICATE OF SERVICE & ELECTRONIC FILING**

I HEREBY CERTIFY that a true copy of the foregoing Reply Memorandum of Defendants

In Response to Plaintiff's Opposition to Motion to Dismiss, with Exhibit, was served via electronic

filing this 2nd day of January 2008, to:

Matthew H. Simmons, Esquire
Simmons & Associates, Chartered
7347 Wisconsin Avenue
Suite 200
Bethesda, MD 20814


*/s/  Laura N. Steel*
Laura N. Steel, Esquire

17

283875.1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA
CIVIL DIVISION

FREDERICK MAWALLA                    :
                                     :
                    Plaintiff        :
                                     :        Civil No.: 1:07-CV-01538 (EGS)
          v.                         :
                                     :
LINDA HOFFMAN *et al.*               :
                                     :
                    Defendants.      :

AFFIDAVIT OF PATRICIA A. CASEY

I, PATRICIA A. CASEY, being above the age of 18, hereby state under oath and upon personal knowledge as follows:

1.      I am Senior Vice President and Deputy General Counsel of Intelsat Corporation ("Intelsat"), 3400 International Drive, N.W., Washington, D.C. 20008.  I have held the position of Deputy General Counsel since October 2001, and prior to that date held the position of Assistant General Counsel at Intelsat from April 2000 to October 2001.

2.      Defendants, Linda M. Hoffman and the Washington, D.C. law firm Freilicher & Hoffman, P.C. have provided legal advice and representation to Intelsat with regard to immigration matters from at least 2000 to the present.  I have been Ms. Hoffman's principal contact at Intelsat from April 2000 to the present.

3.      Intelsat retained Linda Hoffman and Freilicher & Hoffman, P.C. to assist certain Intelsat employees in applying for permanent resident status in the U.S. through employer

EXHIBIT

8

sponsorship. Among those employees was plaintiff, Frederick Mawalla, who was authorized to work in the U.S. at Intelsat as a G-IV visa holder.

4.    In September 2002, Intelsat informed its foreign national employees of an interim rule of the U.S. Citizenship and Immigration Services ("CIS") that allowed concurrent filing of I-485 and I-140 for those petitioners for whom visas were immediately available. Due to budget restraints, Intelsat informed these employees that the Company would not pay for legal or filing fees for employees concurrently filing their adjustment of status applications in 2002, although the Company would pay the fees for those filing in 2003. Upon information and belief, Mr. Mawalla did not file for adjustment in 2002.

5.    I was responsible for the legal aspects of the reduction in force ("RIF") conducted by Intelsat in December 2002, including any immigration-related impact on employees who lost their employment by virtue of the RIF.

6.    Some of the employees subject to the December 2002 RIF, including Mr. Mawalla, were in the process of applying for permanent resident status in the U.S., having been sponsored by Intelsat.

7.    One of the severance benefits that Intelsat provided to Mr. Mawalla and similarly situated RIF'd employees was a $750 allowance for the employee to seek legal advice related to his or her immigration status. A memorandum describing that benefit was provided to Mr. Mawalla at the time the RIF was announced.

8.    The employees subject to the RIF who were offered the $750 benefit were not required to retain Ms. Hoffman to advise them.

9.    At no time prior to the December 2002 RIF was Ms. Hoffman or anyone else at the law firm of Freilicher & Hoffman notified of the identities of any Intelsat employees whose employment would be terminated in the RIF.

10.    On the day after the RIF, I notified Ms. Hoffman of the identities of those employees who were subject to the RIF whose cases were being handled by Ms. Hoffman and whom Intelsat could no longer sponsor for employment-based permanent resident status. I also notified her of the $750 allowance for immigration-related legal advice that Intelsat had decided to offer as a severance benefit to RIF'd employees. I told her that, in the event that any former employees sought to use their allowance by obtaining advice from her, Intelsat would waive any potential conflict of interest.

11.    In September 2004 Intelsat notified CIS that it was withdrawing seventeen I-140 Petitions that had previously been filed on behalf of seventeen employees whose employment subsequently had been terminated. Mr. Mawalla was one of the seventeen names on that list of withdrawals. Intelsat withdrew those I-140s on its own initiative so that it could use the underlying labor certifications in support of any future employees who might be hired to fill similar positions and might need to apply for work authorization and permanent residence.

12.    Neither Ms. Hoffman nor Freilicher & Hoffman, P.C. advised Intelsat to withdraw the I-140 Petition regarding Mr. Mawalla or any of the other former employees.

3

13.    In November 2005, Intelsat received a letter from Paul Sherman Allen, a lawyer, stating that on behalf of Mr. Mawalla, he intended to file a lawsuit against Intelsat for damages related to, among other things, the "revocation of his visa petition."    That letter contained a variety of allegations concerning Intelsat's conduct regarding the circumstances of Mr. Mawalla's employment and termination.  The letter also stated that "Mr. Mawalla applied for adjustment of status by filing an I-485."  This was the first communication that Intelsat received regarding any I-485 petition filed by Mr. Mawalla.  I do not recall ever informing Ms. Hoffman of Mr. Allen's letter because she had nothing to do with his termination or any subsequent actions taken by Intelsat.  I responded to Mr. Allen's letter denying its allegations of wrongdoing by Intelsat.  No lawsuit was ever filed against Intelsat by Mr. Mawalla.

14.    Intelsat did not authorize Paul Shearman Allen to represent Intelsat or act on its behalf in any capacity.  Moreover, Intelsat did not authorize any filings or actions taken on Mr. Mawalla's behalf after the December 2002 RIF, including any I-485 Application to Adjust Status to Permanent Resident and/or any motion to re-open or reconsider with respect to Intelsat's I-140 Petition previously filed on May 2002.  Any effort undertaken after the 2002 RIF by Mr. Mawalla or on his behalf to use or avail himself of the I-140 Petition that was filed and subsequently withdrawn by Intelsat was not authorized by Intelsat.

15.    Intelsat's Human Resources Department received a copy of a letter dated March 13, 2006 from CIS addressed to Frederick Mawalla and Paul Allen Sherman.  The CIS letter denied a motion that had apparently been submitted by Mr. Allen to reopen or reconsider CIS's denial of an Application to Adjust Status to Permanent Resident.

4

16.    To my knowledge, Ms. Hoffman and the law firm of Freilicher & Hoffman were not aware that Mr. Mawalla was pursuing an adjustment application based upon a job that terminated in 2002 until I informed Ms. Hoffman of the March 13, 2006 letter from CIS.

17.    To my knowledge, neither Ms. Hoffman nor anyone acting on behalf of Freilicher & Hoffman took any action that was in any way adverse to her former client, Mr. Mawalla.

I declare under penalty of perjury that the foregoing is true and correct.


_Patricia A. Casey_
Patricia A. Casey
Senior Vice President and Deputy General Counsel
Intelsat Corporation


SUBSCRIBED AND SWORN TO before me on this _3rd_ day of _January_ 2008,

in _Washington_ , _District of Columbia_
    City/County            State


_____
Notary

My commission expires: _31 March 2009_